IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  13-cv-002744-LTB

GERALDINE J. ROMERO,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

        Plaintiff, Geraldine J. Romero, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying her application for disability insurance benefits, filed

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for

supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not

materially assist me in the determination of this appeal.  After consideration of the parties'

briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.  STATEMENT OF THE CASE

        Plaintiff seeks judicial review of the Commissioner's decision denying her applications

for disability insurance benefits and for supplemental security income filed in April of 2009.

[Administrative Record ("AR") 372]  After the applications were initially denied on July 23,

2009, an Administrative Law Judge ("ALJ") conducted an evidentiary hearing on October 20,

2010, and issued a written ruling on November 15, 2010. [AR 77-132, 160-72]  In that initial

ruling, the ALJ denied Plaintiff's applications on the basis that she was not disabled because she

retained the residual functional capacity ("RFC") to perform a full range of light physical work, with some limitations, and thus was capable of performing her past relevant work (Step Four). [AR 170-72]

The SSA Appeals Council subsequently vacated the ALJ's decision, on the basis that: 1) the assessed RFC did not provide any mental limitations or restrictions associated with Plaintiff's anxiety disorder or dysthymic disorder; 2) the ALJ's decision did not adequately evaluate Plaintiff's obesity; and 3) the ALJ's decision concluded that she could perform past work, but it did not adequately evaluate whether those jobs meet the regulatory definition of past relevant work. As such, the SSA Appeals Council remanded for further administrative rulings. [AR 178-80]

The ALJ then conducted a second evidentiary hearing on June 18, 2012 . [AR 33-76] The ALJ issued a second decision, on July 3, 2012, again finding that Plaintiff was not disabled in that she retained the RFC to perform her past relevant work (Step Four). [AR 16-27] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of this determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 1] *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on April 18, 1958, and was 51 years old on March 20, 2009, her alleged onset date. [AR 311] She obtained a high school education via G.E.D. [AR 82, 467] Her past relevant work history was as an order clerk, deli counter worker, administrative assistant, newsroom assistant, and front desk receptionist. [AR 427] Plaintiff alleged that on

March 20, 2009, she became disabled due to her fibromyalgia, high blood pressure and depression. [AR 133]

The record reveals that Plaintiff received medical treatment from Kaiser Permanente and South Federal Family Practice from April 1998 through March 2009.  [AR 556-58, 571-601]   In March 2009, she sought treatment at the emergency room at Denver Health Medical Center, for various ailments. [AR 441-64]  She then became a patient at the Denver Heath Clinic starting in May 2009, where she was seen approximately bi-monthly for fibromyalgia complicated by depression/anxiety.  She was also treated for hypertension, fatty liver disease, and obstructive sleep apnea by her primary care physician, Dr. Jay H. Lee, M.D. [AR 472, 476-525]

During this time, on July 8, 2009, Dr. Mac Bradley, Ph.D., performed a consultive mental examination in which he noted Plaintiff's complaints of symptoms related to anxiety and depression. [AR 466-69]  At this exam Plaintiff reported being anxious around crowds, feeling like she did not fit in, and described a depressed mood, social withdrawal, crying and insomnia. Dr. Bradley opined that Plaintiff had the ability to complete all normal activities of daily living in a "timely, minimally functional manner."  A mental status examination revealed Plaintiff's memory was adequate, and she demonstrated adequate comprehension, judgment and insight. Dr. Bradley diagnosed a dysthymic disorder and an anxiety disorder NOS.  He assigned her a Global Assessment of Function ("GAF") score of 70.  In conclusion, Dr. Bradley did not think that Plaintiff was intellectually impaired, and she had the ability to function above a minimally adequate level.   And, "[o]verall, I do not think she has psychological condition that causes marked or extreme impairment of her abilities in understanding and memory, sustained concentration and persistence, social interaction, or adaptation." [AR 469]

3

Plaintiff continued to receive care at Denver Health with Dr. Lee, her primary care physician. [AR 526-45]  In February of 2010, Dr. Lee indicated he was not willing to assess Plaintiff's ability to perform work related activities, as such evaluation was outside of his scope of practice. [AR 472]  However, he did complete a Colorado Med-9 Form indicating that Plaintiff would be physically disabled for 12 months or longer due to her fibromyalgia, and her symptoms of chronic pain and fatigue. [AR 473-75]  In a follow-up letter to Plaintiff's attorney, dated October 11, 2010, Dr. Lee indicated that he could not identify Plaintiff's functional physical limitations due to the nature of fibromyalgia, but that he believed her when she said she could not seek and maintain full-time employment. [AR 560]

Plaintiff continued to be seen at Denver Health in 2011 and 2012 – for her fibromyalgia, chronic pain, hypertension/edema, obesity and depression/anxiety – first with Dr. Lee and then, beginning in March of 2011, with Dr. L. Marcella Serrano, M.D.  [602-52]  In June 2011, Dr. Serrano noted that Plaintiff's fibromyalgia diagnosis was confirmed in April 2011, and that a rheumatology specialist, Dr. Porter, "discussed disability with the patient and recommend against this [as] she would benefit from staying active and working." [AR 657-58]  Plaintiff's fibromyalgia was, at this time, stabilized on Lyrica, and she stopped seeing the specialist. [AR 657-58]  Also at this time, in August of 2011, she began seeing Ms. Sabrina Santa Clara, a licensed professional counselor with Denver Health. [AR 656-57]

In February of 2012, Dr. Serrano filed out a Colorado Med-9 Form indicating that it was her opinion that Plaintiff was physically disabled for at least 12 months based on her fibromyalgia diagnosis. [AR 621-22]  Dr. Serrano also noted her dysthymic disorder, depression and insomnia as relevant clinical history and mental status considerations. [AR 622]  In a

4

subsequent letter, Dr. Serrano indicated that the Med-9 "was signed anticipating that [Plaintiff] could return to work at some capacity in the future." [AR 658]

In January 2012, Ms. Santa Clara wrote a letter indicating that Plaintiff's primary diagnosis was "Pain Disorder – Associated with Both Psychological Factors and a General Medical Condition," and she opined that Plaintiff "cannot function at any level of normalcy."  In addition, she indicated that Plaintiff suffered from major depressive disorder, "compounded by a trauma history which has left her with a chronic Post Traumatic Stress Disorder diagnosis." [AR 569]  On June 11, 2012, Ms. Santa Clara wrote a letter to Plaintiff's attorney indicating that Plaintiff "suffers from significant anxiety and depression" related to her chronic medical conditions, and opined that she has difficulty sitting in one position for any length of time, her normal activities of daily living are difficult or "sometimes impossible" depending on her level of pain, and when she is able to accomplish daily tasks, she often experiences a "backlash" of increased pain and immobility. [AR 656]  On the same date Ms. Santa Clara also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental). [AR 653-55]  Ms. Santa Clara opined that Plaintiff was markedly limited in her ability to understand, remember and carry out complex instructions, as well as in her ability to make judgments on complex work related activities.  She was also markedly limited in her ability to interact appropriately with the public, supervisor(s) and co-workers, and in her ability to respond appropriately to usual work situations and to changes in routine work setting. [AR 653-55]

## II. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as

5

the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

In his initial ruling on November 15, 2010, the ALJ concluded that Plaintiff was not disabled because she retained the RFC to perform her past relevant work at Step Four of the sequential process. [AR 160-72]  After remand from the SSA Appeals Council, the ALJ again determined that Plaintiff was not disabled at Step Four of the sequential process. [AR 16-27]

The ALJ first found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (Step One). [AR 18]  The ALJ further determined that Plaintiff had the severe impairments of obesity, irritable bowel syndrome, fibromyalgia, sleep apnea, an anxiety disorder, and a dysthymic disorder (Step Two), but that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 18-19]

The ALJ then determined that Plaintiff had the RFC:  to lift and carry 20 pounds occasionally and 10 pounds frequently; to stand and/or walk six hours and sit six hours during an eight-hour workday; and to climb ramps and stairs occasionally, but should avoid climbing ladders, scaffolds and ropes.  In addition, he determined that Plaintiff should avoid exposure to dangerous machines, unprotected heights, excessive vibrations and excessively strong odors. Finally, also he determined that she was able have frequent work interactions with co-workers and the public. [AR 21]  Based on this assessed RFC, and testimony from the vocational expert, the ALJ found that Plaintiff was capable of performing her past relevant work as an order clerk, administrative assistant, newsroom assistant, and front desk receptionist, all as generally performed in the national economy (Step Four). [AR 26]  As such, the ALJ concluded that Plaintiff was not disabled at Step Four of the sequential process and, therefore, was not under

7

disability as defined by the SSA. [AR 27]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).   Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, *supra*, 822 F.2d at 1521 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).  With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  ISSUES ON APPEAL

A. Evaluation of Mental Impairments:

On appeal, Plaintiff first argues that the ALJ failed to adequately evaluate her mental impairments because his rulings as to the degree of her functional limitations – arising from her anxiety disorder and dysthymic disorder – were not adequately evaluated under 20 C.F.R. §404.1520a (and 20 C.F.R. §416.920a) regarding whether her impairments met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment at Steps Two and Three of the sequential process.

An ALJ is required by §404.1520a to apply a "special technique" at Step Two and Three when confronted with a claim of mental impairment. *See Perez v. Colvin,* 2014 WL 5473751 (D.Colo. 2014)(unpublished)(*citing Grotendorst v. Astrue,* 370 Fed.Appx. 879, 882 (10th Cir. 2010)). The first step in that technique is to "evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." *Id.* (*citing* 20 C.F.R. § 404.1520a(b)(1)).

Once medically determinable mental impairments are found, as here, the ALJ must then "rate the degree of functional limitation resulting from the impairment(s)" in the second step. *Id.* (*quoting* 20 C.F.R. §404.1520a(b)(2)). The ALJ does this by rating the claimant's limitations in the following four broad functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §404.1520a(c)(3). The degree of functional limitation resulting from an impairment is identified via consideration of "all relevant and available clinical signs and laboratory findings, effects of [the] symptoms, how the functioning may be affected by factors including, but not limited to, chronic mental disorders, structural settings, medication, and other treatment." 20 C.F.R. §404.1520a(c). After the ALJ assesses the degree of functional limitations in each area, the

severity of the claimant's mental impairment will be determined.  20 C.F.R. § 404.1520a(d).

The ALJ's "written decision must incorporate the pertinent findings and conclusions based on

the technique." 20 C.F.R. § 404.1520a(e)(4).

The ALJ assessed Plaintiff's functional limitations, as caused by her mental impairments,

when concluding that she does not have an impairment or combination of impairments that

meets or medically equals a listed impairment deemed to be so severe as to preclude substantial

gainful employment.  The ALJ found that Plaintiff has mild restrictions in activities of daily

living, mild to moderate difficulties with social functioning, none or only mild difficulties with

regard to her concentration, persistence or pace, and that she experienced no episodes of

decompensation which have been of extended duration. [AR 20]

Plaintiff first takes issue with the ALJ's determination of her limitations in social

functioning.  With regard to that limitation, the ALJ found that "[i]n social functioning, the

claimant had mild to moderate difficulties" in that "[w]hile the claimant spends time with family,

has a good relationship with her family, and is able to shop in stores, she does report some

anxiety in places where there are a lot of people, as well as infrequent contact with her friends.

Thus, in affording the claimant the benefit of the doubt, I find that the claimant has mild to

moderate difficulties in social functioning." [AR 20]  Plaintiff argues that the ALJ relied on Dr.

Bradley's report for this finding, and that such reliance is insufficient under §404.1520a, which

requires consideration of all relevant and available clinical signs and laboratory findings.  I

disagree.  Although the ALJ cited the Dr. Bradley's report, it is clear that the ALJ relied upon the

record as a whole when making this finding.  The ALJ's order is sufficient, under the second step

of §404.1520a(c), to support the degree of limitation assessed by him in the area of social

functioning resulting from Plaintiff's mental impairments.  *See Klobas v. Astrue,* 2010 WL 383141 (D.Colo. 2010)(unpublished)(ruling that "[w]hile the ALJ perhaps could have been more explicit in tying his step two and step three findings to the specific evidence regarding plaintiff's impairments, he nevertheless did in fact discuss in detail the evidence relating to plaintiff's mental impairment").

Plaintiff also argues that the ALJ erred in assessing "none to mild" difficulties with regard to her concentration, persistence or pace.   In making this determination, the ALJ found that:

> The record shows that the claimant is not intellectually impaired, and that, during her mental status examination, she was able to calculate arithmetic problems in the four basic mathematical operations.  Her vocabulary was adequate and she demonstrated adequate comprehension, judgment, and insight in common, everyday situations and issues.  Additionally, the claimant's short and long-term memory was adequate.  Mac Bradley, Ph.D., opined that the claimant's psychological conditions did not cause any marked or extreme impairments of her abilities in understanding, memory, sustained concentration and persistence, as well as social interaction, or adaptation. [AR 20]

Plaintiff argues that the ALJ ignored the evidence that Dr. Bradley only concluded that she did not have marked or extreme impairments in this area and, as such,  it could be inferred that it was his opinion that she actually had marked or moderate limitation in her concentration, persistence or pace. [AR 469, Doc #16, pg. 10]  In so arguing, Plaintiff notes that this characterization of Dr. Bradley's opinion – that her ability to maintain attention and concentration would be marked or moderately limited – was consistent with the determination of the state agency's initial denial of her applications. [AR 133-54]

The ALJ did not find that Dr. Bradley found no impairments in her mental abilities, but rather that he did not find marked impairments.  This evidence supported, at least in part, the

ALJ's determination that she experiences either none or mild difficulties in her concentration, persistence or pace.  I again conclude that the ALJ's order is sufficient, under the second step of §404.1520a(c), to rate the degree of Plaintiff's functional limitation in the area of concentration, persistence, and pace.

Finally, it appears that Plaintiff is also arguing that the ALJ erred in failing to follow the analysis at 20 C.F.R.§404.1520a when assessing Plaintiff's RFC, in that he "failed to include mental limitations in the areas of concentration, persistence, understanding, memory and/or adaptation in the RFC he utilized." [Doc #16 pg. 12]  However, I note that the special technique analysis of §404.1520a only relates to the ALJ's decision at Steps Two and Three of the sequential process.  *See Hansen v. Astrue,* 2008 WL 4216272, 6 (D.Colo. 2008)(unpublished).  To the extent that Plaintiff challenges the ALJ's assessment of her RFC, I find no error, as discussed below.

B.  RFC Assessment

Plaintiff next contends that the ALJ's assessment of her RFC was not supported by substantial evidence.  In support of this argument, Plaintiff first briefly contends that the ALJ failed to discuss, in his order, the physical and mental demands of her past work.  However, as Plaintiff acknowledges, the ALJ did "briefly refer to the vocational expert's opinions" regarding the physical and mental demands of her past relevant work.  In the order, the ALJ set forth the five relevant jobs Plaintiff performed in the past, and the DOT codes connected with the jobs, as well as the level of physical exertion needed, and the Specific Vocational Preparation (SVP) level or skill requirements required to perform each job.  The ALJ properly relied on the testimony of the vocational expert, which was supported by his extensive testimony at the

hearing. [AR 115-17, 427]  *Winfrey v. Chater,* 92 F.3d 1017, 1024 (10th Cir. 1996)(requiring that the ALJ make findings regarding the physical and mental demands of the claimant's past relevant work at Step Four of the sequential process); *Perotin v. Colvin,* 2015 WL 2444424 (D.Colo. 2015)(unpublished).

Plaintiff next argues that the ALJ erred when weighing the medical evidence opinion on the record when assessing Plaintiff's RFC.  She first argues the evidence actually supports a determination that she is not capable of working on a regular and continued basis because the ALJ improperly rejected the opinions of physical disability set forth in the Med-9 forms filled out by her treating physicians, Dr. Lee (on Feb 12, 2010) and Dr. Serrano (on February 23, 2012).  She argues that the ALJ rejected these opinions by failing to apply the factors for evaluating medical opinion evidence as set forth in 20 C.F.R. §404.1527(d) (20 C.F.R. §416.927(d)).  In his order, the ALJ indicated that he afforded Dr. Lee's conclusory opinion that Plaintiff was disabled – as stated on the Med-9 form in February 2010 – "little to no weight" on the basis that:  it was not supported by contemporaneous treatment notes; he had only seen Plaintiff four times since November of 2009; and the records from Denver Health Center did not document any disabling impairments or limitations. [AR 24]   In addition, only six days earlier Dr. Lee indicated that he was "uncomfortable" completing a medical source statement regarding Plaintiff's limitations, and subsequently, on September 27, 2010, he again indicated that he could not assess Plaintiff's functional restrictions, but noted that he believed her own reported limitations.  As such, the ALJ found that although Dr. Lee was a treating source, his opinion of disability "lacks supportability in the record" in that his treatment records "do not present a longitudinal picture of claimant's impairments" and he was "unable to provide as assessment of

the claimant's functional limitations but relied on the claimant to report her capabilities" in order to conclude she is disabled.  "More importantly, Dr. Lee's opinion speaks to an ultimate issue reserved to the Commission and, thus, [is] not entitled to any special weight." [AR 24]  The ALJ's rejection of Dr. Lee's conclusory determination was well supported in his order and by the record.

As to Dr. Serrano's opinion of disability set forth in her Med-9 form in February 2012, the ALJ noted that Dr. Serrano subsequently indicated that she completed this form with the anticipation that Plaintiff would return to work at some capacity in the future and, if the Lyrica worked to control her fibromyalgia, which the ALJ noted it did, then Dr. Serrano believed that she "should be able to return to work in the future." [AR 25]  As such, the ALJ gave little weight to Dr. Serrano's conclusory opinion that Plaintiff was disabled as set forth in the Med-9 form. [AR 25]   Plaintiff contends that Dr. Serrano did not indicate that Plaintiff could return to work if the Lyrica "started to work," as characterized by the ALJ, and also she did not indicate that Plaintiff would be able to work full time or if she would have any limitations.  Rather, she opined that Plaintiff was "disabled" on her Med-9 form, and later indicated that the Lyrica only reduced her pain and caused several side effects. [AR 621, 658]  As such, Plaintiff takes issue with the ALJ's characterization that the Lyrica worked and that it was Dr. Serrano's opinion that Plaintiff could return to work in some capacity. [AR 25]  In addition, Plaintiff challenges the ALJ's conclusion that Dr. Serrano (and Dr. Porter) "advised the claimant against disability." [AR 25]  Rather, Dr. Serrano's notes fail to reveal such advisement, and Dr. Porter's notes only indicate that he "preferred she continue to work."  While I agree that the ALJ's reasons for discrediting Dr. Serrano's conclusory opinion that Plaintiff is disabled, may not support the

14

conclusion that she lied or was wrong when she stated as such on the Med-9 form. However, such evidence certainly undermines her conclusory determination on the Med-9 form, and I disagree with Plaintiff that the ALJ's rejection of Dr. Lee and Dr. Seranno's limited opinion, regarding her ultimate disability, constitutes error. *See e.g. Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012)(finding that the ALJ "properly gave no weight to this conclusory [Med–9] form, which lacked any functional findings.")

Plaintiff also takes issue with the ALJ's decision to give greater weight to the opinion of Dr. Bradley, the consultive physchologist, and no weight to the opinion of her therapist, Ms. Santa Clara, when assessing Plaintiff's RFC. In his order, the ALJ indicated that Ms. Santa Clara opined that Plaintiff suffered from significant anxiety, depression and pain. In addition, she opined that Plaintiff could not function at any level or normalcy, had difficult sitting for any length of time, and activity resulted in physical payback with a significant increase in pain and decreased mobility. The ALJ rejected Ms. Santa Clara's opinion on the basis that it "was beyond the scope of her purported expertise." [AR 25] In addition, Ms. Santa Clara opined that Plaintiff had marked limitation in all areas of social functioning as well as adaptation, and marked limitation in her ability to understand, remember, and carry out complex instructions. Plaintiff also contends that the ALJ erred in giving "little to no weight" to these opinions. [AR 25] In so doing, the ALJ first noted the Ms. Santa Clara was not an "appropriate medical source." As an "other source," the ALJ rejected her opinion on the basis that she did not provide any clinical findings to support her opinions regarding Plaintiff's functional limitations, and that her restrictive opinion was not consistent with other evidence of record, specifically with Dr. Bradley's findings of a GAF of 70, and only some difficulty in functioning. [AR 25-26].

Rather, the ALJ gave Dr. Bradley's opinion "great weight."  Specifically, the ALJ found that:

> In July 2009, Dr. Bradley conducted a consultive psychological examination and found that the claimant's cognitive abilities were intact, her memory and concentration were good, her thought processes and content were normal.  Dr. Bradley assigned a Global Assessment of Functioning (GAF) score of 70, indicative of only mild symptoms or some difficulty in social, occupational, or school functioning.  He opined that the claimant was not intellectually impaired, and that she was able to function above a minimally adequate level.  Additionally, he opined that the claimant's conditions did not cause marked or extreme impairment of her abilities un understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  I afford considerably greater weight to the opinions and findings by Dr. Bradley, than to the opinions of Ms. Santa Clara, since Dr. Bradley's opinions and findings are supported by examination findings.  Moreover, Dr. Bradley's opinion and findings are consistent with those of the State agency psychological consultant . . . which are also entitled to great weight. [AR 25-26]

Thus, the ALJ found that Plaintiff's "only area of significant [mental] limitation is that of social functioning" in the form of "only frequent limitations in work interactions with the public and co-workers." [AR 26]

Plaintiff avers that the ALJ erred when rejecting Ms. Santa Clara's opinions in favor of Dr. Bradley's.  Specifically, she argues that the ALJ failed to fully evaluate Ms. Santa Clara's opinion, as a relevant "other source" under SSR 06-3p.  Licensed professional counselors are not "acceptable medical sources" – and thus may not provide medical opinions – but fall within the category of "other sources" whose opinions may be considered to show the severity of a claimant's impairment.  *See Akers v. Colvin*, 556 Fed.Appx. 754, 757 (10th Cir. 2104) (unpublished)(citing SSR 06–03).  With respect to "other sources" evidence, SSR 06–03p states that an ALJ "generally should explain the weight given to opinions from these 'other sources'" or otherwise ensure the decision permits a reviewer to follow his or her reasoning.  *Id.*

16

Here, the ALJ explained the weight he assigned to Ms. Santa Clara's opinion and the reason for that weight.  Plaintiff argues ALJ erred in rejecting her opinion, at least in part, on the fact that the record did not contain any contemporaneous treatment notes.  Plaintiff notes that the SSA's "Fact Sheet for Mental Health Care Professionals: Supporting Individual's Social Security Disability Claims" indicates that although medical records can be legally disclosed to the SSA, psychotherapy (or process/session) notes are not necessary if they are kept separate from other medical records.  Plaintiff does not aver, however, that Ms. Santa Clara was aware of this Fact Sheet or that any progress/session notes exist, but were not provided to the SAA.  More importantly, Plaintiff does not challenge the ALJ's determination that Ms. Santa Clara's opinion was inconsistent with other substantial evidence of record.  Thus, I find no error in his determination that her opinion was entitled to no weight. [AR 25-26]

In conclusion, I find that, contrary to Plaintiff's argument, the ALJ's order reveals that he properly evaluated and weighed the medical opinions contained in the record when assessing her RFC.

C. Obesity

Plaintiff also asserts that the ALJ failed to evaluate her obesity under Social Security Ruling 02- 01p, which states that obesity is a medically determinable impairment that must be considered when assessing Plaintiff's RFC.

The ALJ did not find that Plaintiff's obesity was a severe impairment, but when assessing the impact of all her impairments, the ALJ found as follows:

> Although there is no specific listing for obesity, SSR 02-1p requires that this impairment be considered . . . concerning musculoskeletal, respiratory, and cardiovascular impairments, respectively, in terms of the potential effects obesity has in causing or contributing to impairments in these systems. A thorough evaluation of the medical record, however, does not support a finding that the claimant has any listing-level impairments caused by or influenced by her obesity. [AR 19]

As such, Plaintiff's claim that the ALJ failed to consider her obesity is belied by the order in which the ALJ indicated that he did consider her obesity, but that the record did not reveal that she experienced impairments caused by her obesity. Contrary to Plaintiff's argument, the ALJ did clearly consider her obesity when considering her functional abilities and limitations, but found that it did not cause or result in any restrictions to be included in her RFC. *See Parks v. Colvin,* 2015 WL 1064177 (D.Colo. 2015)(unpublished)(finding that the ALJ's consideration of the claimant's obesity in the RFC assessment, although brief, "complies with the applicable legal standards"), *citing Flaherty v. Astrue,* 515 F.3d 1067, 1071 (10th Cir. 2007), and noting the Court's general practice "is to take a lower tribunal at its word when it declares that it has considered a matter").

D.  Credibility

Plaintiff also contends that the ALJ failed to properly include in her RFC limitations from her pain and fatigue and, more particularly, that his credibility determinations regarding these alleged limitations were not supported by substantial evidence in the record.

In his order the ALJ indicated that Plaintiff reported that she had constant pain in her hands, neck, arms, legs and back, 24 hours a day and seven days a week due to her fibromyalgia, which is her primary disabling condition. She also indicated concentration problems and that

she had been recently diagnosed with chronic fatigue syndrome.  She testified to side effects from medication including diarrhea, nausea, dizziness and unsteadiness resulting in several reported falls.  She reported her pain level was a 6 or 7 on a scale of 10, but that in the evenings her pain was worse.  She had attempted exercise, but had only gone swimming three times in the past year (and not at all before that) and walked about three days per week for the past three months. [AR 22]

In the previous hearing, the ALJ noted that Plaintiff testified that chronic pain from her fibromyalgia was her most severe problem, but also testified to: off-and-on migraine headaches over the past 8-9 years; an inability to sit, stand or walk for long periods due to severe pain; chronic fatigue, weakness and balancing problems, and an inability to hold anything heavy (i.e. a magazine); and that she has hip pain, neck pain, back pain and occasional headaches. She testified to insomnia and that she needed to nap two to five times a day.  Medication side effects included: dizziness, worsening irritable bowel syndrome, sleepiness, dry mouth, blurred vision, swollen tongue, and watery and itchy eyes and ears.  At that hearing Plaintiff also testified that she could walk for only 15 to 20 minutes, stand for an hour, and sit for 15 to 20 minutes at a time.  She testified that she had three to four "good days" a month, but that she was bedridden all day, three days a week. [AR 22]

In addition, the ALJ noted that the record also contained letters from Plaintiff's sister, and three daughters, indicating that she experienced fatigue, constant pain, swelling, lethargy, lack of focus and concentration, problems with irritable bowel syndrome, headaches, mood swings, and that Plaintiff "is disabled." [AR 22]

19

After consideration of the evidence, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, including her pain, but that her statements, as well as those of her sister and daughters, concerning the intensity, persistence and limiting effects of these symptoms were not fully credible. [AR 22]  In so doing, the ALJ noted the following:

> In terms of the claimant's alleged pain, the claimant's most severe problem, I find the claimant's testimony and statement, as well as those of her witnesses, are not fully credible.  While I do not dispute that the claimant has fibromyalgia, which could reasonably cause some pain and discomfort, the claimant's alleged severity, intensity, and duration of this pain is not fully credible.  The claimant stated that she had constant pain, 24 hours a day, seven days a week, in multiple joints, including her hands, arms, legs, hips, and back, and that she was bedridden, at least, three days a week, all day.  However, while the record documents some complaints of arthralgias, the complaints are not to the extent the claimant now alleges.  For instance in July 2007, George Ho, M.D., recommended that the claimant take only Tylenol 650 mg three times a day for her allegedly disabling pain.  Although the claimant was ultimately prescribed Lyrica to control her pain in February 2010, the record shows that this medication was reasonably effective, and that the claimant's fibromyalgia was better with Lyrica.  Moreover, recent treatment notes show that, while the claimant reported some side effects from Lyrica, the medication, nonetheless, decreased her pain.  A condition, which is reasonably controlled with medication is not disabling.

> Another factor to consider in evaluating the credibility of the claimant's allegations is whether the claimant has exaggerated the facts or magnified her symptoms.  The claimant alleged that she was bedridden about three days a week, for the entire day, and that she had to nap two to five times a day, due to her fibromyalgia and disabling pain and fatigue, however, I find that the claimant's statements are an exaggeration and/or attempt to magnify her symptoms.  Again, while the record documents some complaints of fatigue in the evenings, the record does not document any reports to any treating or examining physical that the claimant is bedridden all day, at least three days a week, or that she needs to nap two to five times a day.  Similarly, the record does not document any medical advice instructing the claimant to remain in bed, all day, or nap up to five times during the day.  However, to the contrary, multiple treating sources have advised the claimant to remain active with work and exercise (swimming and walking).  While the claimant testified that she tried to exercise by swimming, she reported swimming only three times in the past year and none prior.  However, in the

medical records, the claimant reports swimming regularly as of April 2012, and that she has been swimming and walking as of June 2011. This obvious inconsistency undermines the claimant's credibility.

Additionally, the claimant testified that her condition caused her to fall and strike the ground five times, and that [she] reported these incidents to her doctors. However, the record shows only one report of the claimant allegedly falling down stairs in March 2008, which is before her alleged onset date. Thus, the record does not support her statement.

In another example, the claimant testified that, because of her disabling condition, she is unable to hold even a magazine because it is "too heavy." The claimant further asserted that her condition has prevented her from lifting objects the weight of a magazine for a period of time – specifically, since 2008, and that she told her doctors about this problem. Again, contrary to the claimant's assertion, the record is void of any documentation from a treating or examining source to support the claimant's assertion. Moreover, the claimant continues to prepare meals and clean her house, including vacuuming. This evidence tends to discredit the claimant's allegations.

As for the claimant's medication side effects, I find that these side effects are not disabling and are not of the severity and intensity as now alleged by the claimant. For instance, the record shows only one documented complaint of medication side effects in April 2012, due to Lyrica; however, even with the side effects, the claimant continued to take the medication because it decreased her pain. I can reasonably infer that the benefits of this medication outweighed the side effects. As for the claimant's incontinence problems, the record does not document any bladder or bowel incontinence, as well. With respect to the claimant's lower extremity edema, a possible side effect from medication, the record showed that this condition was improved, as of October 2011. The claimant also testified to a treat deal of daytime sleepiness, as a side effect from her medication. However, the undersigned observed the claimant throughout the hearing, and the claimant appeared alert and coherent, not drowsy or sleepy. Thus, based on the record, I do not find that the claimant's alleged side effects are as disabling as she now alleges. [AR 23-24]

While Plaintiff acknowledges that credibility determinations are peculiarly the province

of the finder of fact, she contend that the ALJ's findings are not closely and affirmatively linked

to substantial evidence in the record as a whole but, rather, are conclusions in the guise of

findings.  She argues that the reasoning used by the ALJ to discredit her testimony about her limitations and pain was neither consistent nor supported by the record and, in so doing, refers to several examples which she contends undermines the ALJ's credibility determination.

   For example, the ALJ found that she claimed a new chronic fatigue syndrome diagnosis, which was not documented in the medical records, but she could have been referring only to her symptom of chronic pain. [AR 61]  I note, however, that in her previous testimony she only described "chronic pain" and understood that chronic fatigue syndrome was a diagnosis. [AR 91]  Plaintiff likewise takes issue with the ALJ's reliance on her reports that she was bedridden three days a week, and that she fell on occasion, but that such information was not contained in the medical records on the basis that a physician's failure to note such reports should not be indicative of her veracity.  I disagree, however, as such extreme symptoms – if reported – would likely be noted and addressed by a medical professional.  This is consistent with the ALJ's discrediting of her reported numerous side effects to medications which are also not noted in the medical records.

   Plaintiff also takes issue with the ALJ's finding that Lyrica controlled her pain, when the record show only reasonable effectiveness and reasonable control, and his finding that she can prepare meals and clean the house, because her testimony is "far more limiting" of those activities.  She also argues, and I agree, that ALJ mischaracterized the record when he determined that she needed to nap two to five times a day, as the record is clear that she testified that she needed to nap once a day during the hours of 2:00 to 5:00 in the afternoon. [AR 98]  Finally, Plaintiff concedes that the ALJ was entitled to make the observations that during the hearing she "appeared alert and coherent, not drowsy or sleepy" as an adjudicator is so allowed

under SSR 97-7p, but argues that the ALJ's limited contact with her at the hearings "was not sufficient" to rise above or contradict her reported fatigue.

Plaintiff's argument here amounts to a re-weighing of the conflicting evidence.  The ALJ relied on reasons for discrediting Plaintiff's testimony that was, for the most part, supported by the record.  It is the ALJ's providence to consider and weight inconsistencies in the record evidence when assessing Plaintiff's credibility regarding her subjective symptoms and pain.  20 C.F.R. §404.1529(c)(4).

D. Soc. Sec. Ruling 12-2p

Finally, because the hearing and ruling in this matter was conducted prior to the issuance of Social Security Ruling 12-2p on July 25, 2012  – entitled "Evaluation of Fibromyalgia" – the ALJ had no opportunity to utilize its guidance in his final decision.  Plaintiff contends that the matter should be remanded for reconsideration under SSR 12-2p.

 The ruling at issue notes that fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  And, as such, it provides that:  information from non-medical sources can assist in the evaluating the severity and functional effects of a person's fibromyalgia and may help in the assessment of a person's ability to function day-to-day and over time, "the symptoms and signs of fibromyalgia may vary in severity over time and may even be absent on some days," and a longitudinal record will be considered when possible "because the symptoms of fibromyalgia can wax and wane so that a person may have 'bad days and good days.'"

While it is clear that the ALJ did not have benefit of the guidance of SSR 12-2p, I disagree with Plaintiff that the ALJ's findings and determinations were inconsistent, and/or that his analysis of her pain was inadequate, under its directives.  First, the purpose of the ruling is to provide guidance in assessing the severity of a fibromyalgia impairment.  Nonetheless, this is not a case in which the ALJ failed to consider Plaintiff's fibromyalgia diagnosis, or failed to consider its long term effects or symptoms when determining whether her fibromyalgia medically equals a listing, or whether it medically equals a listing in combination with at least one other medically determinable impairment.  *See e.g. Schuster v. Colvin*, 2014 WL 803461, 3 (D.Colo. 2014) (unpublished).  Rather, the ALJ's order is replete with considerations and findings related to Plaintiff's fibromyalgia diagnosis and resultant symptoms, including pain.  While Plaintiff disagrees with the ALJ's determinations, I conclude that the ALJ's order is consistent with the directives of SSR 12-2p, which was issued after the ALJ's decision was rendered in this case.

ACCORDINGLY, for the foregoing reasons, I AFFIRM the Commissioner's final order.

Dated: June 5, 2015 in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE